**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANSSEN PRODUCTS, L.P. and PHARMA MAR, S.A.,<br><br>Plaintiffs,<br><br>v.<br><br>EVENUS PHARMACEUTICALS LABORATORIES, INC., JIANGSU HENGRUI MEDICINE CO., LTD., FRESENIUS KABI USA, LLC,<br><br>Defendants. | Honorable Renée M. Bumb, Chief U.S.D.J.<br><br>Civil Action No. 20 CV 9369 (RMB) (RLS)<br><br>[Motion Dkt. No. ECF 463] |

**SPECIAL MASTER'S REPORT AND RECOMMENDATION**
**ADDRESSING PLAINTIFFS' MOTION FOR ATTORNEY FEES**[1]

This matter is before the Special Master ("SM") on plaintiffs' Motion for Attorney Fees. Plaintiffs argue they should be awarded fees under 35 U.S.C. §285 because this is an "exceptional" case and pursuant to the Court's inherent authority.[2] The SM received defendants' opposition, plaintiffs' reply, the parties' voluminous exhibits, and held lengthy oral argument. For the reasons to be discussed, it is respectfully recommended that plaintiffs' motion be granted in part and denied in part. To the extent plaintiffs' motion seeks an award of attorney's fees because the case is exceptional, the SM recommends the motion be granted. To the extent plaintiffs ask for payment of all of their litigation fees, it is recommended the motion be denied. It is further recommended that the precise amount of fees to be awarded await further

---

[1] The undersigned was appointed SM to hear plaintiffs' motion in an Order entered on January 9, 2023. ECF 454. This Report and Recommendation ("R&R") is issued pursuant to 28 U.S.C. §636(b)(1).

[2] Given the SM's Recommendation there is no need for the SM to separately address the request for fees pursuant to the Court's inherent authority.

submissions from the parties so that they may address the matters discussed herein. The SM makes the following findings in support of this R&R.[3]

## BACKGROUND

### 1. General Background

At the outset a brief overview of the background of this litigation will be provided with more detail to follow.

This is a Hatch-Waxman action concerning plaintiffs' anti-cancer drug Yondelis®, a treatment for patients with specific types of rare, advanced tumors of the soft tissue after the failure of conventional treatment. Trabectedin is the active ingredient in Yondelis®. Yondelis® is protected by two patents that are at issue: U.S. Patent 8,895,557 (the "'557 Patent") protects the formulation of the product and U.S. Patent 3,420,051 (the "'051 Patent") protects certain steps of the commercial manufacture of trabectedin.

The plaintiffs are Janssen Products, L.P. ("Janssen") and Pharma MAR, S.A. Janssen markets Yondelis®. The defendants are eVenus Pharmaceuticals Laboratories, Inc. ("eVenus"), Jiangsu Hengrui Pharmaceuticals Co., Ltd. ("Hengrui"), and Fresenius Kabi USA, Inc. ("Fresenius"). According to defendants, Hengrui, a Chinese company, was responsible for the research, development, and manufacturing of the generic trabectedin product at issue. Defendants' Response Brief ("RB") at 8. Defendants proffer eVenus is a U.S. subsidiary of Hengrui and that eVenus and Hengrui "together were responsible for the regulatory filings made with FDA associated with Hengrui's trabectedin ANDA and DMF [Drug Master File] to be used in the proposed ANDA product." Defendants further proffer Fresenius is a U.S. entity and was

[3] The parties agree that the three (3) defendants "rise and fall together" as to whether fees should be awarded. July 10, 2023, Transcript of Oral Argument ("Tr.) 67:10 to 68:8.

the commercial marketing partner that intended to market the trabectedin ANDA product in the U.S. following FDA approval. Id.

On June 11, 2020, eVenus served a Paragraph IV Notice Letter regarding the '557 Patent ("Notice Letter") and indicated it intended to market its ANDA product, a generic copy of Yondelis®, prior to the expiration of the patent. On July 23, 2020, plaintiffs filed this patent infringement lawsuit against Hengrui and eVenus and filed a similar separate lawsuit against unrelated entities Natco Pharma, Ltd., Sun Pharmaceutical Industries, Ltd., and Sun Pharmaceutical Industries, Inc. (collectively, "NATCO/Sun"). On October 19, 2020, plaintiffs filed an amended complaint in this case adding Fresenius as a party defendant.

In October 2020, plaintiffs served their first set of interrogatories and requests for documents. Thereafter the parties regularly bickered over stipulations and discovery which will be discussed at length infra. Plaintiffs complain that, inter alia, documents were not produced as they were kept in the ordinary course of business, metadata was missing or corrupted, defendants missed Court-ordered deadlines or produced documents late, and stymied relevant and Court-ordered discovery. In essence plaintiffs generally complain defendants' production was incomplete and deficient. A good deal of the parties' disputes related to defendants' Process B. In October 2020, defendants told plaintiffs they "might" amend their DMF in an attempt to design around the asserted claims of the '051 Patent. Plaintiffs' Corrected Opening Brief ("OB") at 22. A year later, in October 2021, the ANDA and DMF were amended to include Process B. Plaintiffs complain defendants delayed and withheld relevant documents regarding Process B and asserted meritless privilege objections to delay or avoid discovery.

Aside from discovery disputes, plaintiffs' numerous requests asking defendants to stipulate to infringement of the '557 Patent were rebuffed despite defendants having no

articulated non-infringement defense. In addition, plaintiffs claim they learned on January 24, 2022 through defendants' production that defendants possessed copies of their confidential proprietary regulatory filings concerning Yondelis®. This led plaintiffs to complain to federal authorities and, on April 28, 2022, plaintiffs filed a separate trade secret complaint naming defendants. See C.A. No. 22-CV-2499. On May 2, 2022, after plaintiffs brought the issue to the attention of the U.S. Attorney's Office, the Office served a grand jury subpoena on Johnson & Johnson for documents produced by defendants in the case. Plaintiffs' Exhibit ("PExh.") 107.[4]

During a discovery conference with the Court on May 5, 2022, the Court ordered defendants to produce substantial discovery. The rulings were confirmed in an Order entered on May 10, 2022. ECF 283. On May 12, 2022, defendants informed the Court they could not provide some of the requested discovery on account of "blocking statutes" in the People's Republic of China ("China"). On October 4, 2022, defendants represented they intended to convert their Paragraph IV Certification to a Paragraph III Certification, which meant defendants could not market their ANDA product until the expiration of the '557 Patent. ECF 411 at 1-2, 6-7. Defendants amended their ANDA on October 31, 2022.

The case in chief was ended on December 22, 2022 when the Court entered the parties' Stipulation ending the litigation. ECF 445. In summary, the Order barred final approval of defendants' ANDA until plaintiffs' Orange-Book listed '557 Patent expired. The Order also enjoined eVenus-Hengrui from infringing the asserted patents until their expiration, and barred Fresenius from making, selling, offering for sale or using the underlying DMF for any other trabectedin ANDA. The Order preserved the rights of the parties to seek fees and costs.

[4] The parties' trade secret dispute played no part in the SM's findings except as specifically discussed herein. To be clear, the trade secret action is not a valid basis for fees.

**2. The Parties' Contentions**

Plaintiffs allege defendants' conduct in the case "abuse[d]…the judicial process," was "egregious," and evidenced a "pattern of discovery obstruction and litigation misconduct unnecessarily expand[ing] the litigation and burden[ing] plaintiffs and the Court." OB at 1-4. Plaintiffs allege, inter alia, defendants:

(1) misrepresented facts regarding who owns the ANDA, the fact that documents exist, and defendants' discovery efforts;

(2) inappropriately threatened Rule 11 sanctions;

(3) presented baseless invalidity arguments and failed to stipulate to infringement of the '557 Patent despite having no non-infringement defense;

(4) failed to produce agreed discovery and withheld critical evidence;

(5) failed to produce documents as they exist in the ordinary course of business;

(6) withheld and/or produced corrupted metadata;

(7) violated Court-ordered discovery deadlines;

(8) withheld scientific documents based on a false claim of privilege;

(9) defaulted on Orders to produce Hengrui's documents; and

(10) defaulted on Court-ordered depositions, including depositions of all eVenus and Hengrui witnesses.

OB at. 1-2. Plaintiffs argue these transgressions make the case "exceptional" warranting an award of fees.

Not surprisingly defendants vigorously contest plaintiffs' allegations. Defendants argue plaintiffs are to blame for the alleged undue time and effort spent to litigate the case. Defendants contend plaintiffs engaged in a "scorched earth" approach to discovery and pursued ongoing and needlessly aggressive discovery and litigated in an unreasonable manner. RB at 7, 15, 17. Apart

from contesting each of plaintiffs' accusations, defendants argue plaintiffs' own unreasonable litigation tactics are evidenced by their following conduct:

1. asserting the process Patent ('051) despite no infringement contentions;
2. raising metadata issues that had no "substantive relevance" to the case;
3. raising document issues only days before fact discovery deadlines;
4. serving outside counsel Winston & Strawn with a subpoena;
5. declining to transfer a discovery dispute to New Jersey;
6. asking to amend the Discovery Confidentiality Order to send documents to the FDA that were not related to trabectedin; and
7. continuing discovery after defendants agreed to extend the 30 month stay and after defendants indicated they would convert its Paragraph IV Certification to Paragraph III.

Defendants conclude by arguing plaintiffs' request for fess should be denied in its entirety and plaintiffs should pay 100% of the Special Master's fees.

### 3. Summary of Findings and Recommendations

While the SM does not agree with all of plaintiffs' arguments, it nevertheless concludes this is an "exceptional" case warranting a fee award. As will be discussed in detail, the objectively unreasonable manner in which defendants litigated the case makes this case stand out from others. While discovery disputes, missed deadlines, and inadvertent mistakes are not uncommon in high stakes patent litigation, defendants' deceptive representations, delay tactics, obfuscation, and discovery transgressions were serious, material, and prejudicial, and were outside the bounds of what is expected and normally occurs in patent litigation. Defendants' transgressions make this case stand out from others with respect to the unreasonable manner in which it was litigated, making a fee award appropriate.

Plaintiffs ask that they be awarded the full amount of the fees they incurred in the case in the total amount of $4,602,226.26.[5] The SM does not agree this amount should be awarded. Instead, the SM recommends that plaintiffs not be awarded fees for the identified segregable challenged conduct discussed herein that was not unreasonable or exceptional and, therefore, did not contribute to the SM's finding that the case is exceptional. The precise amount plaintiffs should be awarded cannot be determined from plaintiffs' present submission since plaintiffs include a claim for reimbursement of excluded conduct. As a result, the SM recommends that plaintiffs serve a supplemental submission for fees consistent with this Recommendation to which defendants should have an opportunity to respond. Thereafter, a supplemental R&R will be issued addressing the precise amount of fees to award. As to the payment of the SM's fees, the SM recommends they be split evenly between plaintiffs and defendants.

## DISCUSSION

### 1. Applicable Legal Principles to Find a Case is Exceptional

The applicable legal principles are not in serious dispute. Pursuant to 35 U.S.C. §285, the court in exceptional cases may award reasonable attorney fees to the prevailing party.[6] Whether a case is "exceptional" is decided on a case-by-case basis considering the "totality of the circumstances." Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014). An exceptional case is "one that stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Id. There is no precise rule or formula

[5] Kramer-Levin seeks $3,905,562.80. Saul Ewing requests $696,663.46.

[6] Defendants concede plaintiffs are prevailing parties.

for making this determination. Id. As noted in Intellectual Ventures I LLC v. Trend Micro Inc., 944 F.3d 1380, 1384 (Fed. Cir. 2019):

> The district court must determine whether the conduct, isolated or otherwise, is such that when considered as part of and along with the totality of the circumstances, the case is exceptional, i.e., the case stands out among others with respect to the substantive position or the unreasonable manner in which the case was litigated.

The Supreme Court has cited a number of non-exclusive factors that district courts may consider when determining whether a case is exceptional. These factors include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case), and the need in particular circumstances to advance considerations of compensation and deterrence." Octane Fitness, 572 U.S. at 554 n.6. Moving parties must show their entitlement to fees by a preponderance of the evidence. Id. at 557-58.

Importantly, the fact that isolated conduct in a case may be exceptional is not enough to justify a fee award. In other words, a district court should not focus on whether a discrete portion of a case stands out from others. A finding that the entirety of a case is exceptional justifies a fee award, "not a finding of an exceptional portion of a case." Intellectual Ventures, 544 F.3d at 1384. In order to award fees under §285 the SM must find from the totality of the circumstances "that the case overall was exceptional." Id. at 1380. After this finding a court may award fees under §285 in an amount related to particular conduct and circumstances that stand out and made a case exceptional, even if the entirety of the conduct in the case was not exceptional. Id. There is no precise rule or formula for deciding if a case is exceptional; rather, the determination is left to the sound discretion of the district court. Octane Fitness, 572 U.S. at 554-55. The standard is "inherently flexible." Id.

### 2. Defendants' Exceptional Conduct

#### a. Defendants Mischaracterized and Attempted to Conceal their Actual Roles

This case is exceptional based in part on defendants' mischaracterizations of their roles in their Notice Letter, pleadings, briefs, emails and communications with the Court and counsel. Defendants' obfuscation started on the eve of this litigation when they served their June 11, 2020 Paragraph IV Notice Letter which triggered this litigation. PExh. 103. In the letter eVenus held itself out as the ANDA holder and made no mention of Hengrui, the true owner of the ANDA and the DMF. In the Notice Letter eVenus repeatedly used the phrase "its ANDA," giving the false impression that eVenus was the sole owner of the ANDA. Some examples include the statements that "eVenus is authorized to accept service of process in connection with its ANDA," "eVenus offers to provide confidential access to certain information from its ANDA," and "Section … grants eVenus the right to redact its ANDA." (Emphasis supplied). eVenus also referred to its "proprietary ANDA" which was the "property of eVenus." Id. These representations plainly evidence that eVenus held itself out to plaintiffs as the sole owner of the ANDA when this was not true. In truth, eVenus was merely the U.S. agent who filed the ANDA on behalf of Hengrui. RB at 31. eVenus and Hengrui had to have known these representations were misleading when they were made.

The record is plain that the Notice Letter mischaracterizes the role of eVenus and gives the inaccurate impression that eVenus is the sole ANDA holder while at the same time hiding Hengrui's key role. Given the sophistication of eVenus and Hengrui, it is not plausible to believe this was inadvertent or that defendants did not intend to mislead plaintiffs. Defendants' effort to brush off their mischaracterization as "meaningless semantics" (RB at 31) is misguided. Gamesmanship of this sort must be discouraged and deterred. Fortunately for plaintiffs they did

their due diligence before the complaint was filed, learned that Hengrui was the owner of the ANDA and the DMF, and named Hengrui in the complaint. See Royzman Decl. ¶11.[7]

Defendants contend its actions were harmless and fees should not be awarded because plaintiffs were not prejudiced by their mischaracterization. Defendants argue that since Hengrui was named in the complaint and they served their ANDA correctly identifying the parties shortly after the complaint was served, plaintiffs were not prejudiced. What defendants ignore, however, is that actual prejudice to plaintiffs is not a necessary prerequisite to finding that a case is exceptional. The decision in Octane Fitness ruled that a district court should focus on whether defendants' litigation conduct "stands out" as exceptional. 572 U.S. at 554. This is certainly the case when parties misrepresent their basic roles in a dispute. There is no mention in Octane Fitness that prejudice is a necessary prerequisite to finding that a case is exceptional.

Defendants compounded their mischaracterizations in filed pleadings. In its September 28, 2020 answer to plaintiffs' complaint eVenus represented that it was "the holder of the eVenus ANDA" and again referred to "its ANDA." ECF 18, ¶¶6, 21. eVenus made similar mischaracterizations in its November 24, 2020 answer to plaintiffs' first amended complaint (ECF 42 ¶¶6, 24) and its January 7, 2021 amended answer (ECF 63, ¶¶6, 24). eVenus continued its mischaracterizations in its counterclaim which stated: "eVenus included the Offer of Confidential Access … in its Notice Letter to allow Counterclaim Defendants the opportunity to review the relevant portions of eVenus' ANDA." (emphasis supplied). ECF 18, Counterclaim ¶25.

The fact that eVenus understood the importance of correctly characterizing its role is evidenced by the fact that its correspondence to the FDA made it explicitly clear that it was the

[7] According to plaintiffs Hengrui was named in the complaint by "complete happenstance." Tr. 78:14-25.

U.S. Agent for Hengrui. See PExh. 106. Defendants do not adequately explain why they correctly characterized their roles to the FDA but misled plaintiffs. The SM does not know what motivated eVenus' misguided attempt to repeatedly mischaracterize its role and to hide Hengrui's role.[8] Nevertheless, the SM agrees with plaintiffs' argument that "[d]efendants' shifting representations with respect to each of their roles to the ANDA were pure gamesmanship designed to obfuscate basic information and avoid liability." OB at 12.[9]

In addition to mischaracterizing the role of eVenus and attempting to hide the role of Hengrui, defendants misstated and minimized the role of Fresenius. After defendants disclosed to plaintiffs on October 9, 2020 that Fresenius will be responsible for the sale and distribution of eVenus' ANDA product within the U.S. upon launch (PExh. 307), defendants attempted to dissuade plaintiffs from naming Fresenius as a party defendant. Defendants also misrepresented the role of Fresenius by repeatedly stating that Fresenius' "role in this project relates to the distribution of the ANDA product within the U.S." PExh 307 at 9. In addition, defendants attempted to prevent plaintiffs from meaningfully evaluating Fresenius' role by denying them access to key documents and by declining to reveal whether Fresenius controlled the litigation. Despite these efforts, plaintiffs filed their amended complaint naming Fresenius on October 19, 2020.

---

[8] The SM surmises, but does not know for sure, defendants may have been motivated by 21 U.S.C. §355(J)(5)(b)(iii). Under the Hatch-Waxman Act if a brand/patent owner does not file an infringement action within 45 days of receiving a Paragraph IV Certification to trigger the 30-month stay of FDA approval of the generic drug, the FDA may approve the generic drug at any time. Plaintiffs did not learn Hengrui was the ANDA holder until they received the ANDA which was more than 45 days after eVenus' Notice Letter was served. Thus, if by "happenstance" plaintiffs had not named Hengrui in their complaint, Hengrui could have argued the 30-month stay did not apply. See Tr. 81:14 to 83:3. The SM expresses no opinion as to whether defendants' argument would have been successful.

[9] Defendants point to the fact that plaintiffs' trade secret complaint alleged on information and belief that eVenus was the ANDA holder. However, plaintiffs credibly explained this was the result of human error. Tr. 93:6 to 94:10.

It was only after the amendment was filed that plaintiffs learned that, far from the limited role defendants described, Fresenius played a critical role in this litigation. Plaintiffs learned, and defendants do not dispute, that Fresenius had sole control over this litigation. Indeed, defendants acknowledge that Fresenius "call[ed] the shots in this litigation." Tr. 118:1-7. Further, Fresenius had audit rights over Hengrui's development and Fresenius provided input on regulatory strategy and submissions. See March 28, 2016 Exclusive License Agreement Between Hengrui and Fresenius, PExh. 401. In addition, Hengrui was required to consult with Fresenius in advance of all communications with the FDA ("4.1.3 Cooperation"), Fresenius could audit Hengrui's manufacturing facilities ("4.5 Facility Audits"), and Fresenius was responsible for all commercialization activities regarding the ANDA products ("5.1 Responsibility"). Also, documents produced in discovery revealed Fresenius was involved in the development of the ANDA product since 2016, it conducted audits of the manufacturing facilities of Hengrui and third-party suppliers (PExh. 402-406), it participated in team meetings (PExh. 407), it reviewed and provided feedback on draft regulatory submissions (PExh. 408), and it advised eVenus on regulatory strategy. Id.

Defendants' efforts to minimize and mischaracterize Fresenius' role continues to this day as evidenced by their characterization of Fresenius in their Response Brief as merely a "commercial marketing partner." RB at 30. Defendants made a similar mischaracterization at the May 5, 2022 hearing: "Fresenius wasn't involved in — they had no scientists involved with the production. They are limited to being a strategic marketing partner[.]" ECF 297 at 65:7-10. While it may or may not be true that Fresenius had no scientists involved with production, in view of the record evidence it is a gross mischaracterization designed to mislead to state that

Fresenius was merely a "strategic marketing partner."[10] Notably, defendants take no issue with the fact that Fresenius was involved in the development of the ANDA product since 2016, Fresenius' license agreement gave it control over this litigation, audit rights, communications with the FDA, and exclusive responsibility for commercialization activities regarding the ANDA product.

The foregoing evidence rebuts defendants' false characterization that Fresenius' role only "relates to the [sale] and distribution of the ANDA product within the U.S." (PExh. 307 at 9), and that Fresenius was "limited to being a strategic marketing partner." ECF 297 at 65:7-10. Defendants' efforts to obfuscate, hide, and minimize the roles of eVenus, Hengrui, and Fresenius were exceptional. At bottom the SM agrees with plaintiffs' argument: "There were fundamental misrepresentations as to the parties and their roles and they were at a level of basic that was quite extraordinary." Tr. 83:20-23.

### b. Defendants Refused to Stipulate to Infringement of the '557 Patent When Infringement Was Obvious

The record firmly establishes that defendants infringed the '557 Patent. Defendants' Notice Letter evidenced that defendants duplicated Claim 15 of the '557 Patent and defendants' ANDA product includes the same ingredients in the same amounts as recited in Claim 15. See PExh. 101, 112. As set forth in ¶13 of Royzman's Declaration, "[t]he Paragraph IV Notice Letter set out the formulation of the ANDA Product[.] This is the same formulation as Yondelis® - the same ingredients in the same amount."

[10] Although defendants repeatedly emphasized that Fresenius had no scientists involved with production (ECF 297 at 65:7-10) and it had no involvement in product development (ECF 467 at 30-31), plaintiffs presented credible contrary evidence. See PExhs. 403-408.

Defendants' recognition of their infringement is evidenced by the fact that the Paragraph IV Notice Letter did not set forth any basis for non-infringement of any asserted claim. See PExh. 103; see also C.F.R. §314.95(c)(7)(ii) (Paragraph IV Notice should include a "full and detailed explanation of the grounds supporting" non-infringement on a claim-by-claim basis). Further, defendants never asserted any non-infringement defense for Claim 15 or the other asserted claims. See Royzman Decl. ¶21; OB at 15-16. In addition, Hengrui's documents confirm infringement: "In order to avoid the punishment of the infringement act, we should develop other cryoprotectants instead of disaccharides." PExhs. 411, 412.

Despite its clear infringement of the '557 Patent, defendants rebuffed plaintiffs' repeated requests to stipulate to infringement that were made in an effort to streamline the case and avoid unnecessary litigation costs. Plaintiffs first made this request as early as the Rule 26(f) Conference on October 8, 2020. Follow-up requests were regularly made over the course of the litigation including after defendants' infringement contentions were served on February 12, 2021, after plaintiffs' infringement contentions were served on May 7, 2021, after the claim construction opinion on April 7, 2022, and then continuing through May 1, 2022.[11] It was not until defendants converted their Paragraph IV Certification to a Paragraph III Certification in October 2022 – well over two years into the litigation – that defendants ultimately conceded infringement of the '557 Patent. Royzman Decl. ¶24. Defendants' steadfast refusal to admit infringement in the face of compelling evidence forced plaintiffs to serve unnecessary infringement contentions (PExh. 502) and discovery relating to infringement. OB at 16. Delay in withdrawing defenses supports a finding that a case is exceptional. Optis Wireless Tech., LLC

[11] Plaintiffs' repeated requests to defendants to stipulate to non-infringement are well documented. See PExhs. 308 (October 8, 26 and November 5, 2020); 309 (February 19, 2021); 310 (March 9, 29, 2021) 311 (June 16, 2021); 312 (October 7, 2021); 610 (January 6, 2022); 325 (April 3, 2022); and 313 (April 11, 25 and May 1, 2022).

v. Huawei Device USA, Inc., 421 F. Supp. 3d 410, 415 (E.D. Tex. 2019), vacated on other grounds, 2:17-CV-00123-JRG, 2020 WL 5034154 (E.D. Tex. Apr. 3, 2020); see also Magnetar Technologies Corp. v. Six Flags Theme Parks, Inc., C.A. No. 07-127-LPS-MPT, 2017 WL 962760, at *14 (D. Del. March 13, 2017) (attorneys' fees are warranted to deter parties from continuing to maintain claims based on objectively unreasonable positions, including the failure to provide sufficient evidence of infringement).

Defendants' attempt to excuse their refusal to stipulate to infringement by arguing that plaintiffs had the burden of proof. This argument is meritless. If defendants' argument is accepted, then a party would always be justified in refusing to stipulate to infringement. Nevertheless, substantial authority exists to award fees because of the failure to concede infringement in the face of overwhelming evidence. Upaid Sys., Ltd. v. Card Concepts, Inc., No. 17C8150, 2022 WL 4482762, at *2-3 (N.D. Ill. Sept. 27, 2022) (finding case to be exceptional where plaintiff improperly prolonged court proceedings by refusing to acknowledge after claim construction that its infringement claims failed); Bendix Com. Vehicle Sys., LLC v. Haldex Brake Prod. Corp., No. 1:09 CV 176, 2011 WL 14372, at *1 (N.D. Ohio Jan. 3, 2011) (finding case was exceptional because defendant refused to concede infringement despite its clear knowledge its product infringed the patent in suit); Floe Int'l, Inc. v. Newmans' Mfg. Inc., No. CIV 04-5120 OWF/RLE, 2006 WL 2472112, at *7 (D. Minn. Aug. 23, 2006) (finding case was exceptional and awarding fees where defendants needlessly prolonged the litigation by, among other things, refusing to concede infringement); see also MarcTec, LLC v. Johnson & Johnson, 664 F.3d 907, 916 (Fed. Cir. 2012) (affirming district court's finding that infringement case was exceptional where plaintiff continued to pursue infringement despite the lack of evidence).

Remarkably, defendants do not deny they infringed, that they copied the Yondelis® formulation, that they never asserted noninfringement defenses, and that their own documents acknowledge infringement. Yet they still attempt to justify their refusal to stipulate. Defendants' arguments are specious. Defendants explain they were waiting for the Markman ruling in the NATCO/Sun case. However, defendants were not a party to that dispute and they abandoned seeking construction of the claim term they now rely on. In addition, the fact that defendants did not stipulate even before the claimed NATCO/Sun claim construction issue was raised shows defendants' excuse is made up. Further, although the claim term raised by NATCO/Sun was "a single active anti-tumor compound" (RB at 35-36), defendants did not assert that their ANDA product had more than one active anti-tumor compound. Plaintiffs' Reply Brief ("PRB") at 5. Moreover, even after the Markman ruling on April 7, 2022, defendants refused plaintiffs' stipulation request.

Defendants' excuse for refusing to stipulate because plaintiffs would not stipulate to non-infringement of the '051 Patent has no merit. The issues are not connected. Since defendants infringed the '557 Patent, they should have so stipulated to avoid the substantial unnecessary work the parties and Court were forced to dedicate to a non-issue. Whether plaintiffs stipulated to non-infringement of the '051 Patent was a segregable issue that played no part as to what should be done with the '557 Patent.[12]

Defendants also argue that since they asserted an invalidity defense their refusal to stipulate to infringement was justified because they could not infringe an invalid patent. Defendants' argument is rejected. There is no support in the case law that the mere assertion of

---

[12] The SM is aware plaintiffs argue defendants' invalidity challenges to the '557 Patent were meritless and that defendants baselessly pursued defenses of the '051 Patent. As discussed infra, the SM does not find that defendants' actions in this regard were so out of the ordinary to justify a finding of exceptionality.

an invalidity defense excuses a party's failure to stipulate to infringement in the face of compelling evidence.

### c. Defendants' Discovery Responses Were Materially Deficient, Out of the Ordinary and Did Not Comply With Discovery Norms

While discovery disputes and mistakes are not unusual, defendants' discovery transgressions were serious and out of the ordinary. Defendants' conduct failed to comply with discovery norms necessitating needless court attention and a substantial waste of resources. This was a factor the SM took into consideration when it examined the totality of the circumstances to find the case was litigated by defendants in an exceptional manner.

#### *a. Defendants Disassociated Emails From Their Attachments*

Plaintiffs documented that the document productions of eVenus, Hengrui, and Fresenius each separated emails from their attachments. See generally Royzman Decl. ¶¶30-42.[13] As set forth by Royzman, email attachments were either withheld or scattered in the production and, on occasion, attachments were produced thousands of Bates numbers away from the parent email. Id. at ¶31, 33, 37. Defendants' productions were grossly deficient given the clear requirement and practice that emails should be produced along with their attachments. In re Denture Cream Prod. Liab. Litig., 292 F.R.D. 120, 125 (D.D.C. 2013) ("Several courts have held that emails should … be produced along with their attachments.") (collecting cases); Andy Hoang Nguyen v. Roth & Rau AG, No. CCB-06-1290, 2009 WL 10682036, at *2 (D. Md. July 28, 2009) ("[E]mails and their attachments must be produced together.") (collecting cases); PSEG Power N.Y., Inc. v. Alberici Constructors, Inc., No. 1:05-CV-657(DNH/RFT), 2007 WL 2687670, at

[13] Plaintiffs contend thousands of documents from the three defendants were disassociated. Tr. 83:11-18.

*12 (N.D.N.Y. Sept. 7, 2007) ("Without a question, attachments should have been produced with their corresponding emails as such are kept in the usual course of business[.]").

Defendants do not deny their emails were disassociated from their attachments or that attachments were not originally produced. However, defendants argue – without providing any supporting evidence – that this was not intentionally done. Whether or not this is true is beside the point. Defendants are responsible for deficiencies in their production whether intentional or otherwise. See DR Distributors, LLC v. 21 Century Smoking, Inc., 513 F.Supp. 3d 839, 942 (N.D. Ill. 2021) (finding that a party was responsible for supervision of ESI vendor as well as for errors in its production and noting that defense counsel's attempt to blame the vendor was a "nonstarter"); In re Seroquel Prod. Liab. Litig., 244 F.R.D. 650, 664 (M.D. Fla. 2007) (party could not blame vendor for ESI production problems because "a party is responsible for the errors of its vendors"). Contrary to their argument, defendants deserve no credit for rectifying their deficiency after it was brought to their attention. RB at 40. The problem would not have occurred in the first place if defendants had exercised a modicum of ordinary care and diligence.

Furthermore, without making a finding as to whether defendants' deficiency was deliberate, it is dubious defendants' deficient production was "innocently" done. RB at 40. First, defendants proffer no supporting evidence other than their own bald statements to explain why their emails were disassociated. Second, the disassociations occurred in the productions of eVenus, Hengrui, and Fresenius. Royzman Decl. ¶¶31-32. Since the documents were obtained from two continents and likely produced with the aid of different vendors, plaintiffs' argument that it is "implausible" that both vendors made the same mistake is credible. Id.; see also ECF 297 at 24:9-24.

*b. Defendants Produced Corrupted Metadata*

The SM finds that plaintiffs satisfied their burden of showing a substantial portion of defendants' document production contained corrupted or altered metadata. See Royzman Decl. ¶¶30-42; see also OB at 25 ("The metadata for more than half of the documents Defendants produced was either corrupted or missing entirely[.]"). Defendants' deficiencies substantially impeded plaintiffs since plaintiffs "could not perform the type of analysis that metadata typically affords, such as searching documents of a particular custodian, knowing when a particular document was created, targeting specific date ranges, or even pulling up an email and its attachment." OB at 26; Royzman Decl. ¶31.

Given the importance of ESI and its associated metadata, the routine practice in present day litigation of producing workable metadata, and the parties' agreement to produce metadata, defendants' metadata deficiencies were serious and out of the ordinary. The SM is not alone in concluding that a party's materially deficient production of metadata warrants a finding that a case is exceptional. Valador, Inc. v. HTC Corp., No. 1:16CV 1162 (TSE/JFA), 2018 WL 4937057 (E.D. Va. Oct. 10, 2018) (adopting R&R finding that trademark infringement case was exceptional where plaintiff engaged in unreasonable litigation conduct, including failing to produce metadata and failing to produce attachments to certain emails); Adaptix v. Alcatel-Lucent USA, Inc., No. 6:12-CV-22 Lead Case, 2016 WL 6915309, at *4 (E.D. Tex. Mar. 18, 2016) ("[T]he Court finds that Adaptix's manner of litigating the case regarding the conception date, and specifically its failure to produce metadata concerning the critical documents, warrants a finding of exceptionality."). To be sure, ordinary, isolated, and typical discovery deficiencies do not warrant a finding that a case is exceptional. However, the SM agrees with plaintiffs that a "consistent failure to produce a forensically sound document production collection" – as occurred here – "is hardly ordinary." OB at 11-12. This is partly evidenced by the fact that

defendants' production deficiencies affected each of the nine Hengrui custodian's documents. PExh. 325 at 3.

Defendants downplay the significance of their deficient production and complain that plaintiffs focus too much attention on metadata. See RB at 18 ("Plaintiffs had the documents in their possession and [are] focusing on the alleged deficiencies in the accompanying metadata that had no substantive relevance to the case."). Defendants' arguments are rejected. The production and use of forensically sound metadata is routine in present day litigation. Indeed, the cases are legion that acknowledge the importance and relevance of metadata. See Country Vintner of N. Carolina, LLC v. E&J Gallo Winery, Inc., 718 F.3d 249, 253 n.4 (4th Cir. 2013) (metadata provides crucial evidence that is not available in a paper document); Hoehl Fam. Found v. Roberts, No. 5:19-CV-229, 2023 WL 3271517, at *7 (D. Vt. Apr. 13, 2023) (ordering production of complete and accurate metadata and noting that the metadata was necessary "to make defendants' production usable."); Tpi Cloud Hosting, Inc. v. Keller Williams Realty, Inc., No. A-19-CV-00808-JRN, 2020 WL 4718051, at *2 (W.D. Tex. Apr. 13, 2020) (requiring production of document in its original format and the corresponding metadata because "the metadata associated with the file is equally important."); Black Love Resists In the Rust by & through Soto v. City of Buffalo, N.Y., 334 F.R.D. 23, 28 n.3 (W.D.N.Y. 2019) (noting that metadata "makes electronic documents more functional because it significantly improves a party's ability to access, search, and sort large numbers of documents efficiently.").

The SM is aware defendants argue many of plaintiffs' metadata complaints were caused by plaintiffs' mistakes and misloading. RB at 17-20. Nevertheless, there is no getting around the fact that there were serious problems with defendants' metadata production. This is evidenced by the fact the Court ordered defendants to re-collect and re-produce their documents

in a forensically sound manner. ECF 283. Defendants cannot contest that plaintiffs' efforts to advance the case were impeded by their deficiencies since it is obvious the deficiencies delayed the litigation and forced plaintiffs to duplicate work. For example, plaintiffs could not complete the only deposition they took because of the metadata difficulties they encountered. Royzman Decl. ¶¶34-35. Defendants' serious metadata deficiencies are a relevant factor to the SM's exceptionality finding. So too is the fact that Hengrui acknowledges its deficient metadata production. RB at 40-41. Given the scope, manner, and importance of defendants' deficiencies, defendants' mistakes were serious and unusual and not, as defendants argue, "the product of ordinary difficulties[.]" RB at 41. Whether some of the problems were caused by plaintiffs' own mistakes does not have to be decided now. The SM is not yet addressing the amount of fees to be awarded. The SM acknowledges defendants should not be responsible for fees incurred because of plaintiffs' mistakes.

*c. Defendants Delayed or Did Not Produce Custodial Emails of Key Custodians*

Plaintiffs documented that defendants failed to produce emails, or made an incomplete production, of at least four important custodians: Qiong Sun, YingFang Fan, Linmao Ye and Kathy Zhang. Royzman Decl. ¶36, 42. These key witnesses were involved in the preparation of the ANDA, development of defendants' ANDA product and ANDA formulation, attempted design around formulations, the API manufacturing process, and Process B. Further, the production from Dr. Ye, President of eVenus, was deficient. Royzman Decl. ¶¶50-53.[14] Ye was important because he advised defendants on the regulatory aspects of their ANDA product and had two decades experience working with the FDA. OB at 40. Defendants' assertions during

[14] According to plaintiffs eVenus only produced 36 emails from Dr. Ye, 32 of which were calendar invitations, even though Fresenius produced over 500 emails where Dr. Ye was the sender or recipient. Royzman Decl. ¶ 53.

the case that responsive emails did not exist or were inadvertently not produced were not accurate as emails from these witnesses were produced from the files of other custodians. ECF 202 at 8. In addition, defendants acknowledge responsive documents existed but were not properly collected. D.I. 297 at 19:7-20:24; RB at 38. Defendants' argument that there was "no intentional withholding of documents" (RB at 38) is immaterial. Plaintiffs do not have to show intentional misconduct to show that a case or conduct is exceptional.

*d. Additional Discovery Deficiencies*

Thus far the SM has highlighted some of the most extreme conduct that justifies its exceptionality finding. However, by no means is the discussion thus far exhaustive. The SM makes the following additional non-exhaustive findings regarding defendants' serious transgressions to justify its Recommendation that defendants litigated the case in an exceptional manner:

(i) Defendants unduly delayed producing responsive documents. As set forth by plaintiffs, one year after initial requests were served and only one month before the parties' substantial completion deadline (November 12, 2021), defendants collectively only produced 1,100 documents. Ninety percent of defendants' production was produced on the eve of the deadline, and 50% of the total production was made on or after the "substantial completion" deadline. D.I. 202 at 3; OB at 20.

(ii) Defendants' document and ESI production was so deficient that on May 10, 2022, the Court ordered a forensic recollection of the Hengrui production, two major repositories, and a Hengrui server and email application that was not properly searched. ECF 283. The Court ordered a similar recollection and production from eVenus. In addition, the eVenus defendants were ordered to reproduce metadata regarding 147 documents. Id. They were also ordered to search, collect, and produce documents from an eVenus' regulatory shared drive that was not previously done. Id. Defendants acknowledged documents were not collected from eVenus' email servers (PExh. 322 at n.6), even though they had previously represented that eVenus' production was complete. OB at 31-32, 38-39; Royzman Decl. ¶¶49-60.

(iii) Defendants' deficient production impaired plaintiffs' ability to depose Fresenius' V.P. of Corporate Development, Saurably Bhasin, the only

defense witness deposed before the close of fact discovery. Royzman Decl. ¶¶36-37; OB at 27-29.

(iv) Defendants withheld or delayed production or produced redacted versions of plainly relevant non-privileged laboratory notebooks. PRB at 20.

(v) Defendants took the inconsistent position that certain documents were privileged because Fresenius' in-house counsel directed work relating to the scientific development of Process B (RB at 39), while at the same time they argued that Fresenius was not involved in research and development of the ANDA product. Id. at 29-32; Tr. 171:18 to 172:5.

(vi) Defendants unduly delayed producing relevant, non-privileged, and requested Process B documents.

(vii) Defendants represented eVenus' production was complete when they knew or should have known that obvious sources of responsive documents had not been searched and collected.

(viii) Defendants' discovery was so deficient plaintiffs were prevented from taking any depositions of eVenus and Hengrui in the case.

### 3. Plaintiffs' Conduct Was Not Unreasonable

Defendants argue that plaintiffs are to blame for the unduly litigious proceedings and that plaintiffs caused the increased time and effort required to litigate the case. RB at 5 ("Moreover, Plaintiffs are not entitled to any award of fees because of their own conduct in unnecessarily multiplying this litigation."). Defendants raise four (4) main points:

1. Plaintiffs continued to assert the '051 patent even though they did not serve infringement contentions;

2. Plaintiffs engaged in "scorched earth" discovery;

3. Plaintiffs raised unrelated disputes; and

4. Plaintiffs aggressively litigated the case after defendants represented they would not launch the ANDA product prior to patent expiration.

The SM will explain why it disagrees that plaintiffs' conduct was unreasonable to such a degree to excuse defendants' exceptional conduct and to justify disqualifying plaintiffs' fee award.

a. **Plaintiffs' Continued Assertion of the '051 Patent**

Defendants argue plaintiffs' conduct was unreasonable because they continued to litigate infringement of the '051 Patent even though they did not serve the required infringement contentions. Defendants argue plaintiffs were required to serve infringement contentions as to Process B after the DMF and ANDA were amended in October 2021. RB at 16. In response plaintiffs contend they set forth the required infringement contentions since they served contentions for the process defendants intended to practice. Tr. 158: 21 to 159:2.

The SM does not find plaintiffs' refusal to stipulate to infringement of the '051 Patent, and to serve non-infringement contentions directed to Process B, to be unreasonable since plaintiffs had a well-grounded good faith belief that defendants had no intention of using Process B. Plaintiffs credibly argued:

> There is no indication that any chemist ever filed this (Process B) process at Hengrui. There is no indication that the process worked, no scientific data at all. No indication that it was suitable on a commercial scale. No indication that they intended to use it to manufacture their product.

Tr. 157:2-7.

The SM is aware there is authority that indicates parties cannot assume that an ANDA filer will not act in full compliance with its representations to the FDA. In re Brimonidine Patent Litigation 643 F.3d 1366, 1378 (Fed. Cir. 2011). However, Brimonidine is not controlling since plaintiffs had a well-grounded objectively reasonable basis for believing Process B would not be used. There is no indication similar evidence was available in Brimonidine. Further, even if plaintiffs were wrong, they did not act unreasonably since they had an objectively reasonable basis not to stipulate to infringement. See Otsuka Pharm Co. v. Sandoz, Inc., C.A. No. 07-1000 (MLC), 2015 WL 5921035, at *2 (D.N.J. Oct. 9, 2015) (citation omitted) (where a party sets

forth a good faith argument in support of its position it will generally be found not to have engaged in exceptional conduct).

**b. <u>"Scorched Earth" Discovery</u>**

The SM rejects defendants' complaint that plaintiffs engaged in "scorched earth" discovery. There is no doubt the case was heavily litigated and vigorously contested. However, the SM has not seen evidence that plaintiffs unreasonably pursued discovery. It was reasonable for plaintiffs to demand defendants properly produce email attachments and useable metadata, search any and all servers for responsive documents, and follow up and demand complete and accurate responses to their discovery requests. It is not insignificant that, although plaintiffs ultimately prevailed in the case, they were unable to obtain all responsive discovery. This is evidenced by the fact Hengrui never completed its document production and plaintiffs only took one deposition in the case, which was not even completed.[15] Remarkably, plaintiffs did not take a deposition of a single eVenus or Hengrui witness in the case. This hardly represents the result of scorched earth discovery.

**c. <u>Unrelated Issues</u>**

Defendants complain plaintiffs introduced unrelated issues into the case, such as defendants' alleged failure to comply with FDA requirements. Plaintiffs' concern for product safety was not unreasonable. PRB at 30-32 ("Plaintiff felt obligated to address the issue more broadly in the interest of protecting public health and safety."). Besides, plaintiffs are not seeking fees for work related to this dispute.

---

[15] The deposition was corrupted to such an extent that the Court ordered the witness to be re-deposed. ECF 283. Further, it was not unreasonable for plaintiffs to insist defendants produce all responsive documents before they deposed a witness.

Defendants also complain that plaintiffs served a subpoena on Winston & Strawn. However, plaintiffs' subpoena was reasonable since plaintiffs were attempting to obtain relevant information that Hengrui and eVenus did not produce. PRB at 29-30. As plaintiffs explained, "lacking any other means to obtain the information, Plaintiffs served subpoenas . . . on Winston & Strawn, seeking non-privileged information regarding document collection and production efforts." PRB at 29. Also, plaintiffs' reluctance to transfer a discovery dispute to this District was not unreasonable. The SM will not fault plaintiffs for their strategic decision.

**d. Refusal to Stay Case**

Defendants argue plaintiffs' refusal to stay the case was unreasonable. The SM disagrees since plaintiffs' refusal to agree to defendants' one-sided and prejudicial offers was not unreasonable. Dropbox, Inc. v. Synchronoss Techs., Inc., 18-CV-03685-LHK, 2019 WL 3804640, at *3 (N.D. Cal. Aug. 13, 2019) (citation omitted) (plaintiff's decision not to stay discovery given plaintiff's belief that the patents-in-suit were patentable is consistent with "good faith zealous advocacy").

On June 1, 2022, defendants offered to stay the litigation until termination of the trade secret case and criminal investigation, and to extend the 30-month stay of FDA approval. This effectively would have resulted in an indefinite stay because no one could predict when the trade secret case and criminal investigation would end. It was not unreasonable for plaintiffs to refuse to stay their case for an indeterminate time. Plaintiffs explained an indefinite stay would interfere with the consolidated action involving NATCO/Sun and result in multiple trials. Tr. 51.12 to 52:12.[16] Plaintiffs also explained, and the SM agrees, that defendants' goal was to delay

[16] Plaintiffs argue they "would have been prejudiced by having to try the Sun/NATCO case without discovery from defendants that demonstrated validity of the patents." PRB at 16.

the case and avoid discovery, both of which prejudiced plaintiffs because they could not get a ruling on their patents.

Defendants complain that plaintiffs did not accept their August 26, 2022 offer to be bound by the invalidity decision in the NATCO/Sun case. However, plaintiffs point out that defendants' proposal was one-sided and prejudicial because it did not allow plaintiffs to proceed with their Hatch-Waxman claims regarding the Orange Book listed '557 Patent, yet it permitted defendants to continue to pursue FDA approval of their 1:1 copy of Yondelis®. PRB at 17. Defendants' proposal was also unreasonable because plaintiffs needed discovery from defendants to litigate the NATCO/Sun issues. Further, defendants' proposal would lead to inefficient multiple trials on similar issues.

Defendants also argue plaintiffs continued to aggressively pursue discovery even after they informed plaintiffs they "were working towards" converting their Paragraph IV Certification to a Paragraph III Certification. RB 26. Plaintiffs' refusal to put the brakes on discovery was reasonable. The language "working towards" is indisputably vague and gave plaintiffs no assurances as to when and if defendants' ANDA would be converted. On October 4, 2022, defendants informed the Court defendants "intend[ed] to convert the Paragraph IV Certification." Again, this did not render the case moot since defendants made no indication when the conversion would occur. In any event, from October 4 to December 22, 2022, for all practical purposes the parties' discovery efforts ceased and they focused on the stipulation to end the case. Tr. 64:23 to 65:13. Plaintiffs needed an enforceable court order to give them the assurance they needed to protect their interests. This did not occur until the December 22, 2022 Order was entered.

In sum, plaintiffs' refusal to agree to defendants' one-sided proposals to stay the case was reasonable. The SM agrees with plaintiffs that defendants' present misleading arguments that they realistically attempted to end the litigation by providing plaintiffs the relief sought in their complaint. PRB at 18. Defendants knew or should have known their one-sided and prejudicial proposals had no realistic chance of being accepted.

**4. Not All Of Plaintiffs' Arguments Are Accepted**

Although the SM finds that this is an exceptional case warranting an award of attorney's fees, it will discuss why it disagrees with several of plaintiffs' main arguments.

**a. Reliance on Chinese Law**

Plaintiffs make much of the fact that on May 12, 2022 defendants informed the Court they would be unable to produce any additional documents or witnesses because of the "blocking" statutes of China. DExh. 49. The letter was sent after the Court entered its May 10, 2022 Order (ECF 283) confirming the discovery rulings made at the May 5 oral argument. Plaintiffs repeatedly argue defendants violated the May 10 Order by relying on Chinese law as an excuse not to produce responsive witnesses for deposition and delaying or not producing relevant documents. Plaintiffs argue this demonstrates exceptional conduct.

The SM disagrees with plaintiffs that Hengrui's reliance on the cited Chinese law was exceptional.[17] When it wrote its letter Hengrui reasonably believed, rightly or wrongly, that it might be subject to criminal sanctions or other severe consequences under Chinese law if it produced the Court-ordered discovery. Hengrui's position was supported by a Declaration from Chinese counsel who explained the applicability of Article 36 of the Data Security Law of China.

[17] Similarly, Magistrate Judge Singh did not sanction defendants for violating her Order. Corrected Decl. I. Poullaos ¶¶7-9.

DExh. 49, P. Zhicheng Decl. ¶30 ("Hengrui is unable to produce documents in the Patent Case and Trade Secret Case without violating Chinese law. The legal consequence of violating those laws could be serious[.]"). Due to the potential consequences Hengrui faced, as well as the fact Hengrui promptly advised the Court of its predicament, the SM does not agree with plaintiffs that Hengrui should be sanctioned because of its reliance on Chinese law.[18]

Plaintiffs argue Hengrui's conduct was unreasonable since Hengrui was bound by the decision in another case addressing the same Chinese laws as involved in this case. See In re Valsartan Losartan and Irbesartan Prod. Liab. Litig., C.A. No. MDL 2875, 2021 WL 6010575 (D.N.J. Dec. 20, 2021). It is true the Valsartan decision held that as to certain documents a Chinese company could not rely on Chinese law to bar relevant discovery. However, the SM disagrees the case was binding precedent such that Hengrui was necessarily bound by the decision. After applying a balancing test, the Valsartan decision held that some, but not all, documents at issue had to be produced despite Chinese law. The Court in this case could have reached a different result after it applied the balancing test to Hengrui's documents. Further, there is no binding Third Circuit precedent on the issue and the District Judge in this case could have ruled differently.[19] While the SM disagrees with Hengrui's reading of the law, it cannot say Hengrui's position was unreasonable.[20]

[18] While the SM appreciates Hengrui's difficulty, to the extent eVenus relied on Chinese law to withhold discovery its conduct was unreasonable. As an entity based in this country, eVenus had no basis to rely on Chinese law to excuse its discovery obligations. To the extent eVenus relied on Chinese law the SM finds the conduct to be exceptional. The SM confesses the record is not clear as to whether eVenus relied on Chinese law to withhold discovery. Tr. 17:14-17; 50:1-24.

[19] It was not until November 3, 2022 that Judge Bumb indicated defendants would have to produce their documents to plaintiffs or the Court for in camera consideration. DExh. 53: Tr. 53; 65:18 to 66:3. By then the case was on its way to dismissal and it was not unreasonable for discovery to be put on hold or delayed.

[20] Defendants want credit because it took steps to settle and end the case after it decided not to produce responsive Court-ordered discovery. Defendants' actions in this regard do not excuse the exceptional manner in which it litigated the case.

**b. Defendants' Alleged Misrepresentations of Their Collection Efforts**

Plaintiffs argue defendants misrepresented their collection efforts. Plaintiffs contend that between March and May of 2022, defendants repeatedly assured plaintiffs and the Court that their document collection efforts were continuing. OB at 36-38; PRB 21-22. Yet, however, plaintiffs contend they were told by defense counsel on May 19, 2022 that defendants stopped collecting documents from eVenus and Hengrui in mid-March 2022. Royzman Decl. ¶¶ 43-47. Defendants deny document collection efforts stopped. RB at 50; Tr. 29:20-23 ("So I don't doubt that there wasn't much activity that we could do during the [COVID] period, but it was not a shutdown of all efforts [.]"); Tr. 34: 6-9 ("We did not shut down and tell our vendors to pull everything. So we were still trying to work through the issues in case . . . we were actually able to produce."); Tr. 36:14-16 ("We hadn't affirmatively stopped trying to collect, but there were lots of issues that prevented us from actually completing the production."); Tr. 38:1-3 ("The documents were - we were having difficulty actually collecting them, but the efforts were still ongoing."). Given defendants' representations, and plaintiffs' reliance on an oral statement that could be interpreted in different ways, plaintiffs' argument that defendants misrepresented their collection efforts is not a relevant factor to the SM's finding of exceptional conduct.

**c. Defense of the '051 and '557 Patents**

The SM disagrees with plaintiffs' argument that defendants baselessly defended the '051 and '557 Patents. Without addressing the merits of defendants' contentions, the SM finds that defendants' invalidity defense based on obviousness was not unreasonable. See RB at 33-35.[21] It is not insignificant that plaintiffs make this argument without the benefit of expert evidence.

[21] Plaintiffs point to defendants' documents that describe the '557 Patent as "novel and inventive" and state that "the possibility of invalidation is expected to be extremely low." OB at 16-17; PExhs. 420, 431; PRB at 5. However, defendants credibly argue plaintiffs have not shown that the author was an attorney or that he/she had expertise in U.S. patent law.

**d. <u>Rule 11 Threat</u>**

The SM disagrees with plaintiffs' argument that defendants threatened Rule 11 sanctions if Fresenius was joined as a party defendant. OB at 13. Defendants' email speaks for itself. Defendants simply asked plaintiffs for the Rule 11 basis of their amendment. PExh. 307 at 3 ("We therefore ask once again that you explain whether you have any Rule 11 basis to bring suit against Fresenius[.]"). Even though defendants should have known why Fresenius' joinder was appropriate, they did not threaten plaintiffs with Rule 11 sanctions. While defendants' inquiry was unnecessary, the inquiry was not exceptional.

**5. <u>Fee Award</u>**

Having determined that this is an exceptional case warranting a fee award pursuant to 35 U.S.C. §285, the SM is tasked with determining the amount of fees to award. This amount is committed to the "considerable discretion" of the District Court. <u>EagleView Technologies, Inc. v. Xactware Solutions, Inc.</u>, 522 F.Supp. 3d 40, 57 (D.N.J. 2021). Plaintiffs request reimbursement of $4,602,226.26, which represents all of the fees they incurred in the case except for what they already segregated out. However, the fact that a case is deemed exceptional does not automatically entitle the prevailing party to fees for the entire litigation. <u>Datatern, Inc. v. MicroStrategy, Inc.</u>, No. CV1-12225 2018 WL 2694458, at *6 (D. Mass. June 5, 2018) (awarding motion for fees only as to fees reasonably related to plaintiff's judge-shopping activities and fees reasonably incurred after the Court's claim construction decision). Instead, a fee award should "bear some relation to the extent of the misconduct." <u>Intellectual Ventures LLC</u>, 944 F.3d at 1384.

Exercising its discretion, and finding that there are segregable portions of the litigation for which defendants should not have to pay fees, it is respectfully recommended that plaintiffs

not be awarded fees that plaintiffs have already agreed are not compensable as well as fees incurred in connection with the following work:

1. Hengrui's objection to discovery based on Chinese data privacy laws.[22]
2. Defendants' defense of the '051 Patent.
3. Defendants' invalidity defense to the '557 Patent.[23]

Since plaintiffs' current fee application does not segregate their fees, the SM is unable to determine from plaintiffs' fee application the appropriate fee to award. In order to give plaintiffs an opportunity to identify their recoverable fees, the SM recommends that plaintiffs serve a supplemental fee application within thirty (30) days after the ruling on this R&R. Thereafter, defendants shall have thirty (30) days to respond to which plaintiffs may reply in seven (7) days. The SM will thereafter promptly issue a Supplemental R&R addressing the specific amount of fees it recommends be awarded.[24]

Defendants argue, inter alia, any fee should exclude amounts relating to the '051 Patent for which plaintiffs had no infringement contentions, and all fees incurred after June 1, 2022 when defendants sought a stay of the litigation and agreed not to launch. Id. The SM denies this request for the reasons already discussed.

**6. Special Master's Fees**

The last issue to address is the payment of the Special Master's fees. While it is true the SM is recommending that fees be awarded because this is an exceptional case, not all of

[22]To the extent it occurred, eVenus' reliance on Chinese law to withhold discovery was exceptional.

[23] Plaintiffs represent they are not seeking fees for the following work: plaintiffs' motion to amend to address the trade secret dispute, the Discovery Confidentiality Order dispute, the health and safety issues plaintiffs raised, the Winston & Strawn subpoena, the Markman briefing and hearing, and work done exclusively for the NATCO/Sun case. Tr. 66:17 to 70:21.

[24] After the SM receives the parties' supplemental submissions it is likely oral argument will be scheduled.

plaintiffs' arguments have been accepted. The SM has discussed why some of defendants' challenged conduct was not unreasonable. Thus, the SM concludes it would not be fair and equitable to require defendants to pay for all of the SM's fees. To this end the SM exercises its discretion and recommends that the SM's fees be split evenly by plaintiffs and defendants.

## CONCLUSION

In exercising its "considerable discretion" to decide if this is an "exceptional" case warranting an award of attorney's fees, the SM strictly followed the dictates of Octane Fitness and the weight of follow up authority. The SM's Recommendation is not based on a discrete act or only a portion of the case. Nor is the SM basing its Recommendation on the fact that defendants conceded the merits of plaintiffs' case or that the parties' engaged in numerous discovery disputes. Instead, the SM examined the "totality of the circumstances" before concluding this is an "exceptional" case because of the manner in which defendants litigated. Having managed scores of patent cases while on the Bench and having been involved in hundreds and perhaps thousands of bitterly fought high stakes cases while on the Bench and in private practice, the SM finds that due to the manner in which defendants litigated the case, this is an "exceptional" case that stands out from others and was far from ordinary. As already noted, the fact that defendants eventually conceded the case, and was involved in ongoing discovery disputes, was not dispositive to the SM's Recommendation. Instead, the serious, repetitive and objectively unreasonable nature of defendants' transgressions carried the day.

From the outset of the case and continuing throughout the litigation, defendants mischaracterized their role in correspondence, pleadings, briefs and communications with the Court and counsel. Even to this day defendants insist on mischaracterizing and minimizing the role of Fresenius in the face of incontrovertible evidence of its key role. During the case

plaintiffs and the Court had to devote substantial resources to the '557 infringement issue because defendants refused to stipulate when they had no viable defense. While discovery disputes are the norm in high stakes litigation, defendants transgressions here were beyond the pale. Disassembling emails from their attachments and not producing complete and accurate metadata is exceptional. Withholding or delaying discovery from key custodians, producing discovery so deficient it must be re-done, withholding relevant documents based on a questionable privilege claim, failing to check obvious sources for responsive discovery, preventing plaintiffs from taking effective depositions of the parties, and making misleading characterizations to the Court and counsel, are just some of defendants' litigation conduct that was serious and out of the ordinary. This is the sort of conduct that most certainly should be deterred.

To be sure the SM is not crediting all of plaintiffs' arguments. Again, exercising its considerable discretion, the SM finds that there are segregable portions of the case for which defendants should not reimburse plaintiffs' fees. In addition to the subject areas plaintiffs already indicated they are not seeking fees for, the SM identified plaintiffs' segregable work that should not be reimbursed. The SM is convinced this is a fair and equitable result.

## FINAL RECOMMENDATION

Accordingly, and for the foregoing reasons, it is this 25th day of September, 2023, respectfully recommended that plaintiffs' Motion for Attorney Fees be GRANTED in part and DENIED in part. It is recommended that plaintiffs' motion be GRANTED to the extent it asks for an award of attorney's fees because the case was litigated by defendants in an exceptional manner. It is further recommended that to the extent plaintiffs ask for payment of all of their litigation fees the motion be denied. In addition, it is recommended that thirty (30) days after the

ruling on this R&R that plaintiffs serve a Supplemental Fee Application addressing the matters discussed herein. Thereafter a supplemental R&R will be issued addressing the precise amount of fees to award. Plaintiffs should bring their fee application up to date. Last, it is recommended that payment of the SM's fees be split 50/50.

By: *s/ Joel Schneider*
Judge Joel Schneider (Ret.)
Special Master

DATED: September 25, 2023